# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| US HF CELLULAR COMMUNICATIONS, LLC, *et al.*, | : <br> : <br> : |
| Plaintiffs, | : |
| v. | : |
| SCOTTSDALE INSURANCE COMPANY, | : |
| Defendant. | : |

Case No. 2:17-cv-261

JUDGE ALGENON L. MARBLEY

Magistrate Judge Deavers

## OPINION & ORDER

This matter is before the Court on three Cross-Motions for Summary Judgment: Motion for Partial Summary Judgment by Plaintiffs ShipCom, LLC ("ShipCom"), US HF Cellular Communications, LLC ("USHFCC"), and Virsenet, LLC ("Virsenet") (collectively, the "US HF Plaintiffs") (ECF No. 38); Motion for Partial Summary Judgment by Plaintiff Global Wideband HF Net LLC ("Global Wideband") (ECF No. 39); and Motion for Summary Judgment by Defendant Scottsdale Insurance Company ("Scottsdale") (ECF No. 40). For the reasons set forth below, the Court **GRANTS** Scottsdale's Motion for Summary Judgment (ECF No. 40), **DENIES** the US HF Plaintiffs' Motion for Partial Summary Judgment (ECF No. 38), and **DENIES** Global Wideband's Motion for Partial Summary Judgment (ECF No. 39). Further, Plaintiffs' Motion for Leave to File Post-Submission Brief (ECF No. 66) is **DENIED**.

## I.     BACKGROUND

### A.     Factual Background

This is a case about the obligation of an insurance company—Scottsdale—to defend Plaintiffs in an ongoing lawsuit in Alabama, captioned *Robert Stiegler, III, et al., v. ShipCom,*

*LLC, et al.*, Case No. 2-CV-2015-901469 (the "Alabama Lawsuit"). Plaintiffs can be grouped into two categories: (1) the US HF Plaintiffs (ShipCom, USHFCC, and Virsenet); and (2) Global Wideband. Both sets of plaintiffs had insurance contracts with Scottsdale, and the issue is whether, under those policies, Scottsdale has a duty to defend Plaintiffs in the Alabama Lawsuit.

### 1.    The Alabama Lawsuit

The plaintiffs in the underlying Alabama Lawsuit ("Alabama Plaintiffs") are minority shareholders of ShipCom. (ECF No. 35-6 at ¶¶ 1-2). ShipCom is a limited liability company that operates a maritime communications network that facilitates ship-to-ship and ship-to-shore communications using a spectrum of high frequency ("HF") radio waves. (*Id.* at ¶¶ 3, 7). The Federal Communications Commission ("FCC") requires ShipCom to own licenses for the HF spectrum ShipCom uses. (*Id.* at ¶ 10). ShipCom's FCC licenses initially restricted ShipCom's use of the HF radio spectrum to maritime communications and prohibited it from using its frequencies for land-based communication. (*Id.* at ¶ 11).

After Hurricane Katrina, however, the FCC granted ShipCom a waiver to allow it to use its HF radio frequencies for "emergency backup communications for first responders in the event of a catastrophic event that disrupts normal local wired and wireless communications." (*Id.* at ¶¶ 14, 17, 18). After ShipCom was granted the waiver, in addition to maintaining its usual ship-to-ship and ship-to-shore business, it began assembling equipment used in hospitals, nursing homes, and other similar entities that could be activated as a means of back-up communication when a catastrophe disabled other forms of communication—an "emergency button" of sorts. (*Id.* at ¶¶ 22, 23). ShipCom entered into contracts with customers for its "emergency button" service and charged the customers a monthly fee. (*Id.*).

Around October 2011, USHFCC[1] was formed to acquire an 80% interest in ShipCom. (*Id.* at ¶ 26). USHFCC is wholly owned and managed by Virsenet. (*Id.* at ¶¶ 4, 5). Virsenet's managing member is Mr. Edward Bayuk. (*Id.* at ¶ 5). In 2012, USHFCC and ShipCom entered into a Membership Interest Purchase Agreement and a First Amended Membership Interest Purchase Agreement (collectively, the "Purchase Agreements"), under which USHFCC acquired an 80% interest in ShipCom. (ECF No. 45-1). The Alabama Plaintiffs, who had previously owned 100% of ShipCom, retained a 20% interest in the company. (*Id.*). After the companies entered into the Purchase Agreements, Mr. Bayuk purported to be the manager of ShipCom. (ECF No. 35-6 at ¶ 29).

In December of 2012, USHFCC, Virsenet, and ShipCom, through Mr. Bayuk, entered into a Network Management Agreement with Intrado, Inc. ("Intrado"), under which Intrado became the "Manager of the Maritime Services and the Emergency Land-Based HF Services" in exchange for a Management Fee. (ECF No. 45-1 at Ex. 3). According to the Alabama Plaintiffs, USHFCC, Virsenet, and Mr. Bayuk, through Intrado, then cancelled all of ShipCom's "emergency button" contracts and fired all of ShipCom's employees, though they later attempted to rehire them. (ECF No. 35-6 at ¶¶ 33, 34).

The Alabama Plaintiffs subsequently filed the Alabama Lawsuit in the Circuit Court of Mobile County, Alabama on May 29, 2015, against various defendants including ShipCom, Virsenet, USHFCC, Mr. Bayuk, and Intrado.[2] (ECF No. 35 at ¶¶ 7-12). In their initial Complaint, the Alabama Plaintiffs allege that Virsenet, USHFCC, and Mr. Bayuk never intended

---

[1] USHFCC was originally named "US HF Communications Company LLC" but later amended its certificate of formation to change its name to "US HF Cellular Communications LLC"—one of the Plaintiffs in this action. (ECF No. 35-6 at ¶¶ 26, 30).

[2] The Alabama Plaintiffs also sued Rockwell Collins, Inc. ("Rockwell") and ARINC, Inc. (a subsidiary of Rockwell), for allegations relating to an agreement Rockwell/ARINC entered into with USHFCC.

ShipCom to benefit from the Intrado contract, despite the fact that ShipCom's FCC HF radio spectrum licenses and related waiver "are the cornerstone of USHFCC's . . . [and] Intrado's . . . service." (*Id.* at ¶ 39). They further allege that USHFCC wrongfully claimed to own the ShipCom FCC licenses and waiver itself. (*Id.* at ¶ 40). They thus brought various claims individually and on behalf of ShipCom, including: breach of fiduciary duties, self-dealing/usurpation of corporate opportunity, unjust enrichment, squeeze out, conversion, negligence, fraud, state law trademark infringement, and state law deceptive trade practices. (ECF No. 35-6).

On August 19, 2015, the Alabama Plaintiffs filed a First Amended Complaint, which was followed by a Second Amended Complaint on November 25, 2015. (ECF No. 35 at ¶¶ 13, 21, Ex. 8, 15). The Second Amended Complaint added Mr. John Richmond as an individual defendant. (ECF No. 35-15). Mr. Richmond is the Chief Operating Officer of Global Wideband. (ECF No. 39-1at ¶ 1). The Second Amended Complaint alleges that Mr. Richmond purported to be the Chief Executive Officer of ShipCom following the execution of the Purchase Agreements. (ECF No. 35-15 at ¶ 30). In addition to the factual allegations alleged in the Complaint, the Second Amended Complaint also alleges the following:

- USHFCC, Virsenet, Mr. Bayuk, and Mr. Richmond entered into an agreement with Globe Wireless Radio Services Inc. ("Globe")—a direct competitor of ShipCom—for purchase of Globe's business and assets (including licenses) to be combined with ShipCom, but the transaction did not close, resulting in USHFCC paying a $500,000 penalty to Globe;

- USHFCC, Virsenet, Mr. Bayuk, Mr. Richmond, and others associated with them, formed Global Wideband, "a sham entity formed for the improper purpose of usurping ShipCom's corporate opportunity" and Global Wideband then purchased Globe;

- The USHFCC entities ceased paying one of the Alabama Plaintiffs his salary for work at ShipCom; and

- Mr. Bayuk allowed valuable ShipCom FCC licenses to expire.

(*Id.* at ¶¶ 46-50).  The Second Amended Complaint brought the same causes of action as the Complaint.

On April 4, 2016, the Alabama Plaintiffs filed a Third Amended Complaint, adding Global Wideband as a defendant.  (ECF No. 35 at ¶¶ 25-26).  In addition to the allegations in the Second Amended Complaint, the Third Amended Complaint alleges:

- On June 23, 2015 (before Global Wideband purchased Globe's assets), the USHFCC Board of Directors voted to file suit against the Alabama Plaintiffs, put financial pressure on one of them by no longer paying him his salary and forcing him to pay certain expenses;

- Global Wideband entered into a Network Management Agreement with USHFCC/ShipCom giving Global Wideband access to the ShipCom frequencies and effectively transferring 325 HF channels to Global Wideband; and

- In August of 2015 USHFCC filed suit in Delaware against the Alabama Plaintiffs, stopped paying one of them his salary, and demanded he pay certain expenses.

(ECF No. 35-16 at ¶¶ 48, 50, 51).  The Third Amended Complaint contains the same causes of action as the previous complaints (not all are alleged against Global Wideband) and one additional cause of action seeking an equitable or constructive trust on Globe's assets because of alleged insufficient transfers that violated fiduciary duties.  A Fourth Amended Complaint was filed on November 23, 2016.  (ECF No. 35 at ¶ 28, Ex. 17).

### 2.    The Insurance Policies

The USHF Plaintiffs were insured under three consecutive insurance policies from Scottsdale: (1) Business Management and Indemnity Insurance Policy EKS31107211, covering the policy period of July 31, 2013 to July 31, 2014 (the "First USHF Policy"); (2) Business Management and Indemnity Insurance Policy EKS3135588, covering the July 31, 2014 to July 31, 2015 policy period (the "Second USHF Policy"); and (3) Business Management and Indemnity Insurance EKS3165937 for the July 31, 2015 to July 31, 2016 policy period (the Third

USHF Policy."). (ECF No. 35, Ex. 3, 5, 13). The Continuity Date of the US HF Plaintiffs' Policies is July 31, 2014. (*Id.* at Declarations, Item 3). Global Wideband had insurance with Scottsdale through the Business and Management and Indemnity Policy No. EKS3169277 for the September 24, 2015 to September 24, 2016 policy period (the "Global Policy"). (*Id.* at Ex. 14). The Global Policy also covers Jon Richmond, as the Chief Operating Officer of Global, and Edward Bayuk, as the Director of Global. The Continuity Date of the Global Policy is July 31, 2015. (*Id.* at Declarations, Item 3).

Each of the four relevant policies contains an identical duty-to-defend provision which provides: "[i]t shall be the duty of the Insurer and not the duty of the Insureds to defend any Claim. Such Duty shall exist even if any of the allegations are groundless, false, or fraudulent." (ECF No. 35, Ex. 3, 5, 13, 14). Each policy also states that it "cover[s] only claims first made against the insured during the policy period or, if elected, the extended period and reported to the insurer pursuant to the terms of the relevant coverage section." (*Id.* at Declarations). The relevant coverage section is the Directors and Officers ("D&O") Coverage Section which, subject to certain exclusions, provides coverage to the Insureds for "Loss" that the companies or their respective D&Os have become legally obligated to pay because of a "Claim" made during the policy period and properly reported. (*Id.* at D&O Coverage Section ¶ A). "Claim" is defined in relevant part as:

a. a written demand against any Insured for monetary damages or non-monetary or injunctive relief; . . .

c. a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading.

(*Id.* at D&O Coverage Section ¶ B(1).). The policies require the Insureds to give Scottsdale written notice of any Claim as soon as practicable, but in no event later than sixty (60) days after

the end of the respective Policy Period. (*Id.* at D&O Coverage Section ¶ E(1).). A Claim is "deemed to have been first made against the Insured on the date an Insured who is an executive officer, director or general counsel becomes aware of such Claim." (*Id.*).

Section D(3) of the D&O Coverage Section further provides that:

All claims arising out of the same Wrongful Act and Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the policy period:

    a.    the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made; or

    b.    the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Section E.2 below.

(*Id.* at D&O Coverage Section ¶ D(3). "Wrongful Act" means:

any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

    a.    any of the Directors and Officers, while acting in their capacity as such, or any matter claimed against any Director and Officer solely by reason of his or her serving in such capacity;

    b.    any of the Directors and Officers, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company; and

    c.    the Company, but only with respect to Insuring Clause 3. of this Coverage Section.

(*Id.* at D&O Coverage Section ¶ B(9).). "Interrelated Wrongful Acts" means "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transaction or causes." (*Id.* at D&O Coverage Section ¶ B(6).).

Finally, the policies contain the following relevant exclusions:

- **Prior and Pending Exclusion** (D&O Coverage Section ¶ C(1)(k).): Scottsdale is not liable for any Loss on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

  i. any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the Continuity Date; or

  ii. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry.

- **Application Exclusion** (*Id.* at General Terms & Conditions, ¶ D): By acceptance of this Policy, the Insureds agree that:

  1. The statements in the Application are their representation, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by Insurer under this Policy, and that this Policy and each Coverage Sections are issued in reliance upon the truth of such representations; and

  2. In the event the Application, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Insurer under this Policy, this Policy, including each and all Coverage Sections, shall not afford coverage to the following Insureds for any Claim alleging, based upon, or arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:

     a. Any Insured who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the Application, such materials, or this Policy;

     b. Any company or Sponsor Company to the extent it indemnifies any Insured referred to in subsection a. above; and

     c. Any Company, Sponsor Company, Plan, Employee Benefit Plan, or any other entity that is an Insured, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the Parent Company knew the facts misrepresented or the omissions, whether or not such individual knew of the Application, such materials, or this Policy.

- **Prior Knowledge Exclusion** (*Id.* at D&O Coverage Section ¶ (C)(1)(1).): Scottsdale is not liable for any Loss on account of any Claim "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act, fact, circumstance, or situation which any of the Insureds had knowledge of prior to the Continuity Date where such Insureds had reason to believe at the time that such known Wrongful Act could reasonably be expected to give rise to such Claim."

## B. Procedural Background

On March 31, 2017, Plaintiffs initiated this action after Scottsdale denied them coverage for the Alabama Lawsuit. (ECF No. 1). The Complaint alleges four causes of action against Scottsdale: (1) breach of contract under the US HF Policies; (2) breach of contract under the Global Wideband Policy; (3) breach of the implied covenant of good faith and fair dealing; and (4) declaratory judgment. (*Id.*). Plaintiffs seek a declaratory judgment requiring Scottsdale to pay any settlement in the Alabama Lawsuit and stating that they are free to negotiate settlement in the suit without Scottsdale's consent. (*Id.* at 8). Magistrate Judge King bifurcated the damages and bad faith issues and deferred resolution of those issues until after resolution of the coverage dispute. The US HF Plaintiffs and Global Wideband filed Motions for Summary Judgment on the duty to defend issue on December 15, 2017. (ECF Nos. 38, 39). Scottsdale filed a cross-motion for Summary Judgment on the same day. (ECF No. 40). These motions are fully briefed and ripe for review. Additionally, Plaintiffs filed a Motion for Leave to File Post-Submission Brief on May 30, 2018. (ECF No. 66).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences

must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## III.    ANALYSIS

### A.    Leave to File Post-Submission Brief

Plaintiffs seek leave under Federal Rule of Civil Procedure 56(e) to file a brief to address two issues raised during oral argument. (ECF No. 66). Rule 56(e) provides that "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . give an opportunity to properly support or address the fact." Fed. R. Civ. P. 56(e). Local Rule 7.2 provides that after parties file reply memoranda, "[n]o additional memoranda beyond those enumerated are permitted except upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2).

Here, the Court finds that good cause has not been shown. Plaintiffs had ample opportunity through summary judgment motions, responses, and replies, as well as at oral argument, to address all relevant facts and issues. The two issues Plaintiffs seek to address in an additional brief—the relationship between Global Wideband and the underlying transactions involved in the earlier Alabama Lawsuit, and the choice-of-law issue—have indeed been

extensively briefed and discussed. Additional memoranda on these issues will not aid the Court in its decision. The Court therefore **DENIES** Plaintiffs' Motion for Leave to File Post-Submission Brief (ECF No. 66).

## B. Choice of Law

Scottsdale argues that California law governs the instant dispute, while Plaintiffs argue that Ohio law should be applied. In a diversity case, this Court "appl[ies] the choice of law principles of the forum State, here Ohio." *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 185 (6th Cir. 2017), *reh'g denied* (Nov. 30, 2017) (citing *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir 2017)). Under Ohio law, a court must "apply the law of the state with the most significant relationship to the contract when the parties have not specified which state's substantive law should govern the contract." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996) (citing *National Union Fire Ins. Co. v. Watts,* 963 F.2d 148, 150 (6th Cir.1992)). Ohio has adopted the test set forth in the Restatement (Second) of Conflict of Laws § 188, which provides in relevant part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties ... the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place of contracting,
> >
> > (b) the place of negotiation of the contract,
> >
> > (c) the place of performance,
> >
> > (d) the location of the subject matter of the contract, and
> >
> > (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.* at 604-605 (citing Restatement (Second) of Conflict of Laws § 188 (1971)).  The underlying principles stated in § 6 are as follows:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> >
> > (b) the relevant policies of the forum,
> >
> > (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> >
> > (d) the protection of justified expectations,
> >
> > (e) the basic policies underlying the particular field of law,
> >
> > (f) certainty, predictability and uniformity of result, and
> >
> > (g) ease in the determination and application of the law to be applied.

Restatement at § 6.  These sections of the Restatement "only provide a broad general framework for the resolution of choice of law issues" and "[w]ithin that framework, a judge must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which . . . does not proceed with mathematical precision."  *Int'l Ins.*, 86 F.3d at 606.

Under this framework, the Court finds that California law applies.  In considering the first two contacts, the place of contracting and the place of negotiation, the Court finds these factors inconclusive.  As stated in the comments to Section 188, "the place of contracting is a relatively insignificant contact" and the place of negotiation "is less importan[t] when there is no one single place of negotiation and agreement, as for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone."  Restatement (Second) of Conflict of Laws § 188 (1971).  Plaintiffs stated at oral argument that the contract

was negotiated in Ohio, "to the extent it's negotiated at all." *Transcript from May 22, 2018 Hearing* ("Transcript") at 12. Defendants stated that the negotiations happened back and forth by email, between the underwriting manager on behalf of the insurer—who is located in New Jersey—and the insured's agent—who is located in California. *Transcript* at 22. There is therefore a dispute on this issue, but the Court finds these factors relatively insignificant in the instant case. *See Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 950–51 (S.D. Ohio 2002) (finding "[c]ontacts (a) and (b): the place of contracting and the place of negotiation are inconclusive and relatively insignificant"); *Int'l Ins. Co. v. Stonewall Ins. Co.*, 863 F. Supp. 599, 604 (S.D. Ohio 1994), *aff'd,* 86 F.3d 601 (6th Cir. 1996) (finding the first two factors inconclusive when the negotiations were done by telephone in various locations).

Contact (c), the place of performance, favors California law. The Sixth Circuit has held that "a D&O insurance policy is a unilateral contract-the insured has already performed by paying the premium in exchange for the insurance company's promise to provide insurance." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 599–600 (6th Cir. 2004). Therefore, the place of performance is where Plaintiffs paid the premiums—California. *See Transcript* (Plaintiffs state "I have no doubt that the premium emanated from California initially"); *See also Jamhour* at 950–51 ("[T]he place of Plaintiff[s'] performance is arguably in [California], by making payment of the insurance premium from there."); *Pogue v. Principal Life Ins. Co.*, No. 3:14-CV-00599-GNS, 2015 WL 5680464, at *5 (W.D. Ky. Sept. 25, 2015) (finding contact c favors state where insured paid his premiums); *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d

223, 234 (3d Cir. 2010) ("Sprinturf was obligated to pay premiums to Continental, and, thus, it performed where it paid the premiums.").[3]

Contact (d), the location of the subject matter of the contract, is not particularly relevant here. Applying Ohio choice of law principles, this Court has held that the location of the subject matter is "wherever [the insured] was subject to liability,"—here, "throughout the country." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 863 F. Supp. 599, 606 (S.D. Ohio 1994), *aff'd*, 86 F.3d 601 (6th Cir. 1996). Because there is not one principal location of the insured risk, this factor does not favor either California or Ohio law. *See id.*; *see also Specialty Surfaces Int'l, Inc.*, 609 F.3d at 234 ("The fourth factor, 'location of the subject matter of the contract,' does not favor the application of either California or Pennsylvania law because the policy provided nationwide coverage to Sprinturf, and thus there is no identifiable location for the risk insured by the contract.").

Finally, contact (e)—the domicile, residence, nationality, place of incorporation and place of business of the parties—favors California law. Generally, "a corporation's principal place of business is a more important contact than the place of incorporation." Restatement (Second) of Conflict of Laws § 188, cmt. e (1971). Here, the insured LLCs are registered in Delaware, *Transcript* at 13, but their principal place of business, as represented on the face of the insurance

---

[3] Some courts find that an insurer performs under a contract where it is required to defend the insured, i.e. where the underlying lawsuit was filed. *See Specialty Surfaces Int'l, Inc.*, 609 F.3d at 234 (3d Cir. 2010) (finding insurer "performs under the contract of insurance where it is required to defend or pay benefits to" insured); *Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc.,* 524 F.3d 588, 596 (5th Cir.2008) (concluding that the insurer's performance took place where it defended the underlying lawsuits). Even if it is necessary for the Court to consider this factor in the Sixth Circuit, Scottsdale's place of performance would be Alabama, where the underlying lawsuit was filed. Thus, this does not lean in favor of Ohio or California, and on balance this contact still favors California.

contracts and policy documents, is California. *See, e.g.*, ECF No. 35-2 (2013 insurance application for USHFCC LLC, Virsenet LLC, and ShipCom LLC, listing address as 668 North Coast Hwy #517, Laguna Beach, CA, 92651), ECF No. 35-3 (First US HF Policy, listing same California address), ECF No. 35-5 (Second USHF Policy, listing same California address), ECF No. 35-13 (Third USHF Policy, listing same California address); ECF No. 35-14 (Global Wideband Policy listing same California address). At least two individuals insured under the policies, Mr. Bayuk and Mr. Richmond—both named defendants in the Alabama Lawsuit, reside in California. *Transcript* at 12. The insurer, Scottsdale, is an Ohio company, but its principal place of business is Arizona. *Transcript* at 23. On balance, then, giving more weight to the place of business of the parties, as instructed by the Restatement, this factor favors California law. *See Jamhour*, 211 F. Supp. 2d at 951 (finding contact (e) weighing heavily in favor of Louisiana law when the "only Ohio contact in these factors is the residence of" one party).

The weight of the principles in §6 also favors the application of California law, specifically the justified expectations of the parties and the need for certainty, predictability, and uniformity of results. This dispute involves policy language that sets out the insureds and insurer's duties to each other, and the parties "have sound reason to expect a uniform and consistent interpretation of the policy language setting out the [parties'] duties in the event of an occurrence." *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 710 (6th Cir. 2002). "With uniformity of interpretation, [both parties] would be able to foretell with accuracy their rights and responsibilities under the contract." *Id.* It thus makes sense to find that the law of California—where the insureds under the policies have their principal places of business—

applies, rather than applying the law of Ohio, where Plaintiffs just happened to file suit.[4] Further, the ease in the determination and application of the law to be applied referenced in § 6(g), favors the application of California law given that this is "an insurance contract[] [that is] national or international in scope." *Meijer, Inc. v. Gen. Star Indem. Co.*, 61 F. 3d 903 (6th Cir. 1995) (finding that this consideration favored the application of the law of the state where the insured was incorporated and had its principal place of business, despite insurer being incorporated and having its principal place of business in a different state).

Finally, the policies themselves contain provisions and endorsements specific to the state of California, lending further credence to the decision to apply California law. *See Byer v. Wright*, 827 N.E.2d 835, 837–38 (Ohio Ct. App. 2005) ("We also note that the insurance policy contains a document notifying Ecolab of the requirements of Ohio law with respect to uninsured-motorist and underinsured-motorist ("UM/UIM") coverage. The policy also contains an Ohio endorsement. While their decisions are not necessarily dispositive, other courts have found that such changes evidenced intent by the parties to be bound by Ohio law."); *In re Buckeye Countrymark, Inc.*, 251 B.R. 835, 839 (Bankr. S.D. Ohio 2000) (finding that an insurance contract's mention of Ohio law in the heading of an endorsement to the policy supported conclusion that Ohio law applied).

In sum, while this is a difficult case and a close call, the weight of the factors tips in favor of the application of California law. Ohio does not have a significant interest in this case. *See*

---

[4] It is possible that Plaintiffs could argue that Ohio law applies no matter where a lawsuit is filed, because Scottsdale is an Ohio company. Ohio courts have held, however, that "where nationwide coverage is provided . . . a large insurer . . . has no legitimate expectation that the law of its residence will apply in other states" so the insurers' location in a state is not sufficient to create justified expectations. *See Byer v. Wright*, 827 N.E.2d 835, 837–38 (Ohio Ct. App. 2005).

*Mill's Pride*, 300 F.3d at 709 (finding that Michigan did not have most significant relationship to insurance contract when "[t]he parties' insurance policy . . . makes no mention of Michigan law; [and] it covers no insured that is incorporated in Michigan or that has a place of business in Michigan"). Indeed, Plaintiffs admitted at the hearing that the only interest Ohio has in the case is that it is the home of one of the parties, Scottsdale. *Transcript* at 14-15. The Court finds that this is not enough.

Plaintiff attempts to avoid the application of California law by arguing that there is no real conflict between Ohio and California law, and thus this Court need not resort to choice-of-law principles. (ECF No. 45 at 12-13). This case, however, turns on the question of whether timely notice was given and what impact late notice has on the insurer's duty to defend, and as evidenced by the parties' briefs and arguments, the answer to these questions differs under Ohio law and California law. Plaintiffs can make no persuasive argument to the contrary—in fact, they admitted at oral argument that "the only area where there might be a conflict, if the Court were to look to California law and compare that to Ohio law, would be in the area of whether late notice . . . vitiates coverage. That is the only area where there might be a true conflict." *Transcript* at 15. There is, indeed, a true conflict, and thus the choice-of-law analysis is necessary.

## C.  Applicable Law

In California, interpretation of an insurance policy is a question of law. *Cal. Traditions, Inc. v. Claremont Liab. Ins. Co.*, 197 Cal. App. 4th 410 (Cal 4th App. Dist. 2011). Insurance policies are construed under the same rules that govern interpretation of other contracts, and thus courts attempt to give effect to the mutual understanding of the parties at the time of contracting, which is ascertained from the "clear and explicit" language of the contract. *St. Paul Mercury*

*Ins. Co. v. Frontier Pac. Ins. Co*, 111 Cal. App. 4th 1234, 143 (Cal. 4th App. Dist. 2003). The words of the contract are to be interpreted "according to the plain meaning which a layman would ordinarily attach to them." *Id.* "An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable*." *Id.* (internal citations omitted) (emphasis in original).

A duty to defend arises when a suit "potentially seeks damages within the coverage of the policy." *Fed. Ins. Co. v. MBL, Inc.*, 219 Cal. App. 4th 29, 49 (Cal. 6th App. Dist. 2013). Under the eight corner rule, "the determination of whether a duty to defend exists is made, in the first instance, by comparing the allegations of the complaint and the terms of the policy." *Id*. "As long as the underlying complaint contains language creating the potential of liability under an insurance policy, the duty to defend is implicated." *Hirschberg v. Lumbermens Mut. Cas.*, 798 F. Supp. 600, 602 (N.D. Cal. 1992). When "the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even where the bare allegations in the complaint suggest potential liability." *Waller v. Truck Ins. Exh., Inc.*, 11 Cal. 4th 1 (Cal. 1995).

"In other words, if any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage [but] . . . [o]n the other hand if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." *Saarman Constr., Ltd. v. Ironshore Specialty Ins. Co.*, 230 F. Supp. 3d 1068, 1076 (N.D. Cal. 2017). The existence of the duty to defend "turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit." *Carlson v.*

*Century Sur. Co.*, 832 F. Supp. 2d 1086, 1090–91 (N.D. Cal. 2011). Thus, an insurer "may not rely on later developer *evidence* to show that it was ultimately correct about its denial of defense." *Id.* at 1091 (emphasis in original). The relevant question is "what the insurance company knew when it denied coverage." *Id.* at 1093.

The insured bears the burden of establishing that a loss comes within the basic scope of coverage, thereby triggering the duty to defend, while the insurer bears the burden of proving that an exclusion to coverage applies. *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1557 (9th Cir. 1991) (citing *Royal Globe Ins. Co. v. Whitaker*, 181 Cal.App.3d 532 (Cal 1986)). The insurer has a "high burden" to "prove" that the underlying claim "cannot fall within the policy coverage." *Saarman Constr.*, 230 F. Supp. 3d at 1076. In interpreting an insurance policy, "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, [while] exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 636 (2003).

### D. Scottsdale's Duty to Defend the US HF Plaintiffs

There is no dispute that the type of claims at issue would be covered under the US HF Policies if they were made after the inception of the policies, timely reported, and not barred by any exclusion. Scottsdale contends, however, that the claims are not covered for a number of reasons, including that the Claim was first made prior to the inception of the US HF Policies, the Claim was not timely reported, and three exclusions bar coverage: the Prior and Pending Exclusion; the Application Exclusion; and the Prior Knowledge Exclusion. This Court agrees that the Claim was not timely reported, and thus need not address the remaining arguments.

Scottsdale argues that it has no duty to defend because the Claim was not timely reported, which is a condition precedent to a claims-made-and-reported policy. "A 'claims made' policy

requires a claim to be made against the insured during the specified policy period." *PIMG, Inc. v. Carolina Cas. Ins. Co.*, No. 09-CV-2022 BEN (CAB), 2010 WL 11594809, at *3 (S.D. Cal. Mar. 5, 2010). "A 'claims made and reported' policy includes the added requirement that a claim be reported during the policy period." *Id.* These policies "only cover claims reported to the insurer *during* the policy period. Timely reporting of the claim is thus the event *triggering coverage*; this condition is enforceable according to its terms." *KPFF, Inc. v. California Union Ins. Co.*, 56 Cal. App. 4th 963, 972 (Cal. Ct. App. 1997) (internal citations omitted) (emphasis in original). An insurer need not show prejudice from an insured's delayed reporting in order to reject coverage for claims not timely reported. *See PIMG*, 2010 WL 11594809, at *3 ("The Notice-Prejudice Rule provides that an insurer cannot assert lack of timely notice as a defense unless the insurer was actually prejudiced by the delay. . . . Courts have consistently held, however, that the Notice-Prejudice Rule does not apply to claims made and reported policies."). Finally, California Courts "consistently recognize[] that, absent an agreement to the contrary, the renewal of a policy does not extend a policy's reporting period." *Id.* at *2.

The US HF Policies are claims-made-and reported policies that require the Insured to give Scottsdale written notice of any Claim as soon as practicable, but in no event later than sixty days after the end of the Policy Period. (ECF No. 35, Ex. 3, 5, 13, 14 at D&O Coverage Section ¶ E(1).); *see also PIMG*, 2010 WL 11594809, at *4 (finding that insurance contract with nearly identical reporting language was a "claims made and reported" policy). The Alabama Lawsuit was filed on May 29, 2015, during the Policy Period of the Second USHF Policy. (ECF No. 25 at ¶ 7). The Second USHF Policy Period ended on July 31, 2015. The US HF Plaintiffs did not report it until January 8, 2016—nearly eight months after it was filed and four months after the

60-day reporting deadline.  (*Id.* at ¶ 23).  Therefore, like in the *PIMG* case, the claims were not timely filed in accordance with the contractual provisions.

Plaintiffs cite *Helberg v. National Union Fire Ins. Co.* for the proposition that because the coverage was renewed, the fact that the Alabama Lawsuit was filed during the Second Policy Period but not reported until the Third Policy period should not "precipitate a trap wherein claims spanning the renewal are denied."  102 Ohio App.3d 679 (1995).  This argument is not persuasive for a few reasons.  First, the *Helberg* case is an Ohio case, and as discussed above, California law applies to this action.  California courts, and many other courts, strictly enforce the reporting requirements, even when a policy is renewed.  *See Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387 (Cal Ct. App. 2008) (finding no coverage when insured failed to notify insurer of the claim within 30 days after the expiration of the first policy, as required, despite fact that coverage was renewed and claim was reported during second policy); *Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F. Supp. 2d 180, 194 (S.D.N.Y. 2000) "[M]ost courts that have confronted [the issue] have concluded that a renewal does not extend the reporting period for claims made during the earlier policy period.").

Further, the insurance contract in *Helberg* required the insured to notify the insurer during the policy period and did not have the sixty-day timeframe language that the US HF Policies had.  102 Ohio App.3d at 680-81.  The *Helberg* contract also explicitly included "continuously renewed" language excluding "acts or omissions occurring prior to the effective date of the first policy issued . . . and continuously renewed thereafter."  *Id.* at 834.; *see also Checkrite*, 95 F. Supp. 2d at 196 (distinguishing *Helberg* on the basis of its continuous coverage language).  Thus, the US HF Plaintiffs' argument that the claim was timely reported since it was reported during the Third Policy are not persuasive.

Scottsdale does not have a duty to defend the US HF Plaintiffs in the Alabama Lawsuit because the US HF Plaintiffs did not report their claims timely under the language of the policy. The Court therefore **DENIES** the USHF Plaintiffs' Motion for Summary Judgment.

### E.      Scottsdale's Duty to Defend Global Wideband

Scottsdale argues that it does not have a duty to defend Global Wideband because both the Prior and Pending Exclusion and the Application Exclusion apply. Because the Application Exclusion bars coverage here, the Court need not reach the applicability of the Prior and Pending Exclusion.

Scottsdale contends that the Application Exclusion bars coverage for the Alabama Lawsuit as a result of misrepresentations on the Global Wideband Application. The "Prior Activities" question asked if "the Applicant or any person proposed for this insurance in his or her capacity as an employee, officer, or director of the Applicant or *another entity* [has] been the subject of or involved in any . . . litigation" within the last three years. (ECF No. 35, Ex. 12) (emphasis added). Mr. Bayuk, who filled out the application on behalf of Global Wideband, answered in the negative, despite the fact that the Alabama Lawsuit had been filed against US HF and Mr. Bayuk months before the application was filled out. (ECF No. 35) (Mr. Bayuk executed the Revised Global Wideband Application on August 31, 2015, and the Alabama Complaint was filed on May 29, 2015, naming him as a defendant). Mr. Bayuk, as CEO of both US HF and Global Wideband, constituted a person who was proposed for insurance under the Global Policy, and he was involved in a lawsuit within the last three years in his capacity as an officer of another entity—US HF.

Global Wideband contends that "another entity" could refer to an entity who was applying for insurance under the application, and since no entity applying for insurance was

involved in litigation, the statement was truthful. (ECF No. 51 at 11). "[A]nother entity" is not defined in the application or policy, but "Applicant" is defined in the application as "all corporations, organizations or other entities set forth in Question 1. of the General Information section of this Application, including any subsidiaries, proposed for this insurance." Global Wideband's proposed interpretation of "another entity" as "an entity who was applying for insurance" would render the addition of "another entity" superfluous—"another entity" would always fall under the "Applicant" umbrella. Under the plain, unambiguous language, "another entity" means any other entity—not just one applying for insurance under the Application.

Plaintiffs contend that whether an officer of the insured had been involved in litigation in his capacity as an employee or director of another entity is irrelevant but the Court disagrees—it could be relevant to the insurers' decision of whether or not to insure a company. If the insurer knows, for example, that one officer or director has a history of being sued for business-related actions at previous companies that employed him, the insurer may not want to insure the proposed insured company, for fear that the particular employees' actions will lead to another suit.

Global Wideband also argues the misrepresentation was not material, but the plain language of the contract states that any misrepresentations in the Application are deemed material. ECF No. 35, Ex. 3, 5, 13, 14 at General Terms & Conditions, ¶ D (By acceptance of this Policy, the Insured agree that . . . the statements in the Application are their representations, *that such representations shall be deemed material* to the acceptance of the risk or the hazard assumed by the Insurer under this Policy, and that this Policy and each Coverage Section are issued in reliance upon the truth of such representations") (emphasis added). Thus, the Application Exclusion applies and Scottsdale does not have a duty to defend Global Wideband in

the Alabama Lawsuit.[5]   Global Wideband's Motion for Summary Judgment is therefore **DENIED**.

## F.      Bad Faith

In addition to the causes of action relating to Scottsdale's duty to defend, Plaintiffs also bring a claim for breach of the implied covenant of good faith and fair dealing.  (ECF No. 1).  Plaintiffs argue that the issue of whether Scottsdale acted in bad faith cannot be decided at this time because the Magistrate Judge bifurcated the issues of coverage and bad faith.  Defendants contend that because there is no coverage for the Alabama Lawsuit under any of the Policies, the Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

If there is "no duty to defend under the terms of [an insurance] policy, there can be no action for breach of the implied covenant of good faith and fair dealing." *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639 (Cal. 1995), *as modified on denial of reh'g* (Oct. 26, 1995); *see also Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (Ct. App. 1990) (holding that "a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted.").  This is "because the covenant is based on the contractual relationship between the insured and the insurer" and is used to supplement the express contractual provisions to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement.  *Walker*, 900 P.2d at 639.

---

[5] Scottsdale also argues that there was another misrepresentation that falls under the Application Exclusion.  In the Global Wideband Warranty, Mr. Richmond affirmatively represented that he had "no knowledge of any wrongful act, fact, circumstance or situation which might reasonably be expected to give rise to a claim under the above captioned coverage," despite his knowledge that the Alabama Lawsuit had already been filed.  The Warranty was signed on August 27, 2015, after the original Complaint was filed but before the Second and Third Amended Complaint were filed.  Given the Court's decision that the Application Exclusion was triggered as a result of the Prior Activities question, this issue need not be decided here.

Without an insured "*primary* right to receive the benefits of his contract . . . the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." *Love*, 221 Cal. App. 3d at 1153 (emphasis in original).

For the reasons discussed above, Scottsdale does not have a duty to defend Plaintiffs in the Alabama Lawsuit. Plaintiffs cannot, therefore, maintain an action for breach of the implied covenant of good faith and fair dealing. Thus, Scottsdale's Motion for Summary Judgment (ECF No. 40) is **GRANTED** and the case is dismissed in its entirety.

## IV.    CONCLUSION

Plaintiffs' Motion for Leave to File Post-Submission Brief (ECF No. 66) is **DENIED**. Because the US HF Plaintiffs did not timely report the Alabama Lawsuit within sixty days of the end of the Second US HF Policy, this Court **DENIES** the US HF Plaintiffs' Motion for Summary Judgment (ECF No. 38). And because there was a misrepresentation on Global Wideband's Application triggering the Application Exclusion, this Court **DENIES** Global Wideband's Motion for Summary Judgment (ECF No. 39). The Court hereby **GRANTS** Scottsdale's Motion for Summary Judgment (ECF No. 40).

**IT IS SO ORDERED.**

_____/s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  June 12, 2018**